[No. H033951. Sixth Dist. Nov. 19, 2010.]

THOMAS S. ROBINSON, Plaintiff and Appellant, v. ENDOVASCULAR TECHNOLOGIES, INC., et al., Defendants and Respondents.

## COUNSEL

Audet & Partners and Joseph E. Russell for Plaintiff and Appellant.

Gordon & Rees, Jack B. McCowan, Jr.; Wheeler Trigg O'Donnell, Michael O'Donnell and Sean G. Saxon for Defendants and Respondents.

## OPINION

**MIHARA, J.**—Plaintiff Thomas S. Robinson, who suffered severe injuries after he was implanted with the Ancure Endograft System (Ancure Device), brought a products liability and personal injury action against defendants Endovascular Technologies, Inc. (EVT), Guidant Corporation (Guidant), Advanced Cardiovascular Systems, Inc., and Origin Medsystems, Inc.[1] The trial court granted defendants' motions for summary judgment on the ground that plaintiff's claims were preempted by federal law. Plaintiff has filed a timely appeal from the judgment of dismissal. We find no error and affirm.

---

[1] EVT designed, manufactured, and distributed the Ancure Device. Guidant is the parent corporation of EVT. Both Advanced Cardiovascular Systems, Inc., and Origin Medsystems, Inc., had some involvement in the design and testing of the Ancure Device.

## I. Federal Regulation of Medical Devices

"In enacting the Medical Device Amendments of 1976 (MDA) (21 U.S.C. § 360c et seq.) to the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.), Congress sought to ' "provide for the safety and effectiveness of medical devices intended for human use." ' (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 474 [135 L.Ed.2d 700, 116 S.Ct. 2240] (*Lohr*).) The MDA divides medical devices into three classifications: class I, class II, and class III. (21 U.S.C. § 360c(a)(1).) A class III device, such as the Ancure Device, receives the most federal oversight, and requires premarket approval by the FDA." (*McGuan v. Endovascular Technologies, Inc.* (2010) 182 Cal.App.4th 974, 977 [106 Cal.Rptr.3d 277] (*McGuan*).)

However, prior to obtaining premarket approval, a manufacturer of a class III device may apply for Food and Drug Administration (FDA) authorization to use the device for clinical testing pursuant to an investigational device exemption (IDE). (See 21 U.S.C. § 360j(g).) A manufacturer is prohibited from conducting research of a device in the United States on human subjects without approval by the FDA and an institutional review board (IRB). (21 C.F.R. §§ 812.20, 812.42, 812.62 (1994).)[2]

In order to obtain an IDE, an applicant must submit "a plan for any proposed clinical testing of the device and a report of prior investigations of the device" (21 U.S.C. § 360j(g)(3)(A)); information about "the methods, facilities and controls used for the manufacture, processing, packing, storage and . . . installation of the device" (21 C.F.R. §§ 812.20(b)(3) (1994)); an example of agreements to be executed by all investigators and the identities of all such investigators (21 C.F.R. § 812.20(b)(4)–(5) (1994)); details of each IRB that has been or will be asked to review the investigation and certification of the IRB's decision (21 C.F.R. § 812.20(b)(6) (1994)); details about the institution where the testing will occur (21 C.F.R. § 812.20(b)(7) (1994)); proposed labeling for the device (21 C.F.R. § 812.20(b)(10) (1994));[3] and "[c]opies of all forms and informational materials to be provided to subjects to obtain informed consent" (21 C.F.R. § 812.20(b)(11) (1994)). After reviewing this information, the FDA notifies the applicant that the proposed investigation has been approved, approved with modifications, or disapproved. (21 C.F.R. § 812.30 (1994).)

---

[2] We refer to the Code of Federal Regulations in effect when defendants applied for IDE approval from the FDA.

[3] In addition to listing the relevant contraindications, hazards, adverse effects, warnings and precautions that must be included on the labeling, the FDA also requires that the labeling "shall not bear any statement that is false or misleading in any particular and shall not represent the device is safe or effective for the purposes for which it is being investigated." (21 C.F.R. § 812.5(b) (1994).)

After the IDE application has been approved, the FDA prohibits any deviation from the investigational plan, design, manufacturing techniques, clinical protocol, warnings or consent form which could potentially affect clinical subjects unless the FDA first approves the change. (See 21 C.F.R. § 812.35 (1994).) An applicant must maintain records and make reports "to the Secretary of data obtained as a result of the investigational use of the device during the exemption, as the Secretary determines will enable him to assure compliance with such conditions, review the progress of the investigation, and evaluate the safety and effectiveness of the device." (21 U.S.C. § 360j(g)(2)(B)(ii).) The applicant must also comply with any "other requirements as the Secretary may determine to be necessary for the protection of the public health and safety." (21 U.S.C. § 360j(g)(2)(B)(iii).) The FDA may withdraw its approval at any time in the event that an applicant does not comply with the approved clinical protocol. (21 C.F.R. § 812.30(b), (c) (1994).)

## II. Statement of Facts

In June 1994, defendants submitted an application for an IDE to conduct clinical trials for the bifurcated endovascular grafting system. The bifurcated graft was a companion device to the tube graft that was already being tested under IDE G910177. Shortly thereafter, the FDA sent a letter assigning control number "IDE G940077" to the application. This IDE application consisted of over 650 pages and provided reports of prior investigations, a description of the device, results of various tests performed on the device, an investigational plan, information about the investigators and the IRB, sales information, labeling information, a sample informed consent form, and manufacturing information. In July 1994, the FDA conditionally approved the IDE G940077 application and stated, " 'you may begin your investigation at an institution in accordance with the investigational site waiver granted below, after modifying your consent form in accordance with item 1 below.' "

In June 1998, defendants submitted a revised protocol as part of "Supplement 25" to the IDE G940077, and requested approval of an "iliac balloon catheter." A month later, the FDA granted conditional approval of the revised phase III clinical trial protocol for the Ancure Device and requested that defendants respond within 45 days to 12 identified deficiencies. The FDA disapproved of the use of the modified iliac balloon catheter. After defendants submitted additional supplements to IDE G940077 to address the various deficiencies, the FDA noted that defendants were permitted to continue the clinical study of the Ancure Device in October 1998.

The FDA never informed defendants that it was taking any action to withdraw its approval of the IDE G910177 or IDE G940077 applications prior to the granting of premarket approval of the Ancure Device. Nor did it take any action to suspend or halt the IDE clinical trial.

On December 16, 1998, plaintiff agreed to participate in the IDE clinical study for the Ancure Device. Plaintiff signed a consent form, which stated, in relevant part, that the study was designed to "determine the long term safety and effectiveness of a new investigational device called the Ancure endograft system." The form disclosed potential risks, including infection, graft leakage, continued aneurysm growth, and blood clots. It also noted that "[d]ue to the investigational nature of the device, there may be other risks that are currently unknown." Plaintiff was then implanted with the Ancure Device in December 1998.

On March 15, 1999, defendants submitted a premarket approval application for the Ancure Device. On September 28, 1999, the FDA approved defendants' application.

### III. Statement of the Case

In November 2003, plaintiff filed a complaint in which he alleged that he had suffered severe injuries after he was implanted with the Ancure Device in December 1998. His complaint alleged seven causes of action: strict product liability (failure to warn); strict product liability (Rest.2d Torts, § 402A); negligence; breach of express warranty; breach of implied warranty; fraudulent concealment; and punitive damages. The complaint did not allege that defendants violated FDA regulations, deceived the FDA, or provided incomplete or inaccurate information in connection with the IDE application.

In August 2008, defendants filed a motion for summary judgment on the ground that plaintiff's claims were preempted by 21 United States Code section 360(k) of the Medical Device Amendments of 1976 (MDA; Pub.L. No. 94-295 (May 28, 1976) 90 Stat. 539). Plaintiff filed opposition to the summary judgment motion. After granting the motion for summary judgment, the trial court entered judgment in favor of defendants.

### IV. Discussion

#### A. Standard of Review

"In bringing a motion for summary judgment, a party bears the 'burden of persuasion' that there are no triable issues of material fact and that the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic*

*Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) A defendant may be entitled to judgment as a matter of law where there is 'an affirmative defense to that cause of action.' (Code Civ. Proc., § 437c, subd. (*o*)(2).) After the defendant meets the burden of establishing all elements of the affirmative defense, the burden shifts to the plaintiff to show that a genuine issue of material fact exists as to that defense. (Code Civ. Proc., § 437c, subd. (p)(2).) 'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' (*Aguilar*, at p. 850, fn. omitted.) Our review of a ruling on a summary judgment motion is de novo. (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 316 [40 Cal.Rptr.3d 313].)" (*McGuan, supra*, 182 Cal.App.4th at p. 981.)

## B. Federal Preemption

In *McGuan, supra*, 182 Cal.App.4th 974, this court summarized preemption principles regarding the MDA and class III devices as follows:

 "Congress has the power under the supremacy clause of article VI of the federal Constitution to preempt state law. '[S]tate law that conflicts with federal law is "without effect." ' (*Cipollone v. Ligget Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608], quoting *Maryland v. Louisiana* (1981) 451 U.S. 725, 746 [68 L.Ed.2d 576, 101 S.Ct. 2114].) As the United State Supreme Court has explained, federal law preempts state law in three circumstances. 'First, Congress can define explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation] and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one. [¶] Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. . . . [¶] Finally, state law is pre-empted to the extent that it actually conflicts with federal law.' (*English v. General Electric Co.* (1990) 496 U.S. 72, 78–79 [110 L.Ed.2d 65, 110 S.Ct. 2270].)

"The preemption provision of the MDA states in relevant part: '[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—[¶] (1) which is

different from, or in addition to, any requirement applicable under this chapter to the device, and [¶] (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.' (21 U.S.C. § 360k(a).)

■ "The United States Supreme Court considered the scope of this preemption provision in *Riegel* [*v. Medtronic, Inc.* (2008)] 552 U.S. 312 [169 L.Ed.2d 892, 128 S.Ct. 999]. In *Riegel*, the plaintiffs alleged that the defendant's catheter, a class III device, was 'designed, labeled, and manufactured in a manner that violated' state common law, and that these defects caused severe injuries. (*Riegel*, at p. 320 . . . .) The plaintiffs' complaint stated claims for 'strict liability; breach of implied warranty; and negligence in the design, testing, inspection, distribution, labeling, marketing, and sale of the catheter.' (*Riegel*, at p. 320 . . . .) At issue was whether the preemption provision in the MDA barred common law claims that challenged the safety and effectiveness of class III devices which had received premarket approval by the FDA. (*Riegel*, at p. 315 . . . .) In resolving this issue, the court articulated a two-part test: (1) 'whether the Federal Government has established requirements applicable to' the defendant's catheter, and (2) if so, whether the 'common-law claims are based upon [state] requirements with respect to the device that are "different from, or in addition to" the federal ones, and that relate to safety and effectiveness.' (*Riegel*, at pp. 321–322 . . . .)

"The court first found that premarket approval imposes federal requirements because it is granted 'only after [the FDA] determines that a device offers a reasonable assurance of safety and effectiveness' and because 'the FDA requires a device that has received premarket approval to be made with almost no deviations from the specifications in its approval application.' (*Riegel, supra*, 552 U.S. at p. 323 . . . .) Turning to the second question, the court, relying on *Lohr, supra*, 518 U.S. at page 512, concluded that tort duties under common law impose ' "requirement[s]" ' and would be preempted by federal requirements specific to a medical device.' (*Riegel*, at pp. 323–324 . . . .) As the court explained, 'excluding common-law duties from the scope of pre-emption would make little sense. State tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme no less than state regulatory law to the same effect. Indeed, one would think that tort law, applied by juries under a negligence or strict-liability standard, is less deserving of preservation. A state statute, or a regulation adopted by a state agency, could at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA: How many more lives will be saved

by a device which, along with its greater effectiveness, brings a greater risk of harm? A jury, on the other hand, sees only the cost of a more dangerous design, and is not concerned with its benefits; the patients who reaped those benefits are not represented in court.' (*Riegel*, at p. 325 . . . .) Accordingly, the court held that the plaintiffs' common law claims were preempted by federal law. (*Riegel*, at pp. 323–324 . . . .)" (*McGuan, supra*, 182 Cal.App.4th at pp. 981–983.) Applying the test set forth in *Riegel*, this court held in *McGuan* that state law claims for strict product liability, negligence, breach of express warranty, and breach of implied warranty in connection with the Ancure Device were preempted by the MDA.[4] (*McGuan*, at p. 983.)

Here, plaintiff's complaint alleged defendants failed to provide adequate warnings with the Ancure Device; there were defects in the design, testing, and manufacture of the Ancure Device; defendants were negligent in designing, manufacturing, testing, advertising, warning, marketing, and selling the Ancure Device; defendants breached an express warranty that the Ancure Device was "safe and well tolerated"; defendants breached an implied warranty that the Ancure Device was "of merchantable quality and safe for the use for which it was intended"; and defendants intentionally failed to disclose that the Ancure Device was "dangerous, defective, and likely to cause serious consequences to users."

In contrast to *McGuan* and *Riegel*, the present case does not involve premarket approval of the Ancure Device. Plaintiff argues that under *Riegel* state claims are preempted only after an FDA finding of safety and effectiveness. He takes the position that an IDE approval is analogous to the "§ 510(k)" approval in *Medtronic, Inc. v. Lohr, supra*, 518 U.S. 470 (*Lohr*) in which the Supreme Court held that the plaintiff's state law claims involving a medical device that had received § 510(k) approval were not preempted.

In *Riegel, supra*, 552 U.S. 312, the court distinguished medical devices that have received § 510(k) approval with those that have received premarket approval. "A new device need not undergo premarket approval if the FDA finds it is 'substantially equivalent' to another device exempt from premarket approval. [Citation.] The agency's review of devices for substantial equivalence is known as the § 510(k) process . . . ." (*Riegel*, at p. 317.) "Premarket approval, in contrast, imposes 'requirements' under the MDA as we interpreted it in *Lohr*. Unlike general labeling duties, premarket approval is

---

[4] In *Riegel*, the issue of whether the breach of express warranty and negligence in manufacturing causes of action were preempted was not before the court. (*Riegel v. Medtronic, Inc., supra*, 552 U.S. 312, 321, fn. 2 (*Riegel*).)

specific to individual devices. And it is in no sense an exemption from federal safety review—it *is* federal safety review. Thus, the attributes that *Lohr* found lacking in § 510(k) review are present here. While § 510(k) is ' "focused on equivalence, not safety," ' [citation], premarket approval is focused on safety, not equivalence. While devices that enter the market through § 510(k) have 'never been formally reviewed under the MDA for safety or efficacy,' [citation], the FDA may grant premarket approval only after it determines that a device offers a reasonable assurance of safety and effectiveness, [citation]. And while the FDA does not ' "require" ' that a device allowed to enter the market as a substantial equivalent 'take any particular form for any particular reason,' [citation], the FDA requires a device that has received premarket approval to be made with almost no deviations from the specifications in its approval application, for the reason that the FDA has determined that the approved form provides a reasonable assurance of safety and effectiveness." (*Riegel*, at pp. 322–323, some italics omitted.)

In our view, IDE approval of a medical device is more similar to premarket approval than § 510(k) approval. "[A]lthough the IDE process and the PMA process are not identical, a comparison of the governing regulations reveals no material differences." (*Kemp v. Medtronic, Inc.* (6th Cir. 2000) 231 F.3d 216, 227.) In granting IDE approval, the FDA imposes detailed requirements on the design, manufacture, and warnings for class III devices as well as the conduct of the clinical investigation. Prior to granting IDE approval, the FDA must determine whether "the risks to the subjects are not outweighed by the anticipated benefits to the subjects and the importance of the knowledge to be gained, or informed consent is inadequate, or the investigation is scientifically unsound, or there is reason to believe that the device as used is ineffective." (21 C.F.R. § 812.30(b)(4) (1994).) Thus, these requirements allow the FDA to "evaluate the safety and effectiveness of the device." (21 U.S.C. § 360j(g)(2)(B)(ii).) Safety and effectiveness of the device, however, are not paramount concerns in § 510(k) approval. Pursuant to the § 510(k) process, the FDA compares " 'a post-1976 device to a pre-1976 device to ascertain whether the later device is no more dangerous and no less effective than the earlier device. If the earlier device poses a severe risk or is ineffective, then the later device may also be risky or ineffective.' [Citation.]" (*Lohr, supra*, 518 U.S. at p. 493.) Moreover, the purpose of an IDE, which is "to encourage, to the extent consistent with the protection of the public health and safety and with ethical standards, the discovery and development of useful devices intended for human use and to that end to maintain optimum freedom for scientific investigators in their pursuit of that purpose" (21 U.S.C. § 360j(g)(1)) is more consistent with that of the premarket approval of a medical device. In contrast, the purpose of § 510(k) approval is to promote competition among manufacturers of medical devices. (*Lohr*, at p. 494 ["In providing for this exemption to PMA review, Congress intended merely to

give manufacturers the freedom to compete, to a limited degree, with and on the same terms as manufacturers of medical devices that existed prior to 1976."].) In addition, unlike a device marketed under § 510(k) that is not required to " 'take any particular form for any particular reason' " (*Riegel, supra,* 552 U.S. at p. 323), a device that has received IDE approval is subject to ongoing review for safety and effectiveness. (21 U.S.C. § 360j(g)(2)(B)(ii).)

Nor are we persuaded that an FDA finding that a medical device is safe and effective is necessary for IDE preemption. We agree with the reasoning of *Slater v. Optical Radiation Corp.* (7th Cir. 1992) 961 F.2d 1330: "The FDA can hardly be expected to specify the safe and effective design of a device when it is still experimental. If there were a known safe and effective design, the device would no longer be experimental. The point of the experiment is to find out whether it is safe and effective. [Citation.] In the experimental phase the appropriate regulations of safety and effectiveness are procedural rather than substantive ones. They do not specify the safe and effective design; they specify the procedures for determining whether the experimental design is safe and effective. *These are requirements relating to safety and effectiveness and they can therefore have preemptive effect.* [¶] Of course the FDA will not grant an investigational-device exemption unless it believes that the device has sufficient promise of being proved safe and effective to justify the risk of its being used on human beings. Although that belief is different from a certification that the design of the device is safe and effective, *it is a certification that the design is sufficiently safe and effective to allow experimental use on human beings.*" (*Id.* at p. 1333, italics added.) Accordingly, we conclude that *Riegel* is controlling in cases involving medical devices that have received IDE approval.

■ Applying the test set forth in *Riegel*, we have concluded that the FDA has established requirements applicable to the Ancure Device under the IDE, thereby satisfying the first prong of the *Riegel* test. The second prong has also been satisfied. Plaintiff's complaint was based on alleged defects in the design, testing, and manufacture of the Ancure Device and the failure to warn of all possible adverse side effects. However, plaintiff has not alleged that defendants violated FDA regulations. Since the FDA authorized the use of the Ancure Device for clinical testing pursuant to an IDE prior to plaintiff's surgery, the FDA approved the device's design, testing, intended use, manufacturing methods, and labeling. Thus, to the extent that plaintiff's complaint alleged that the Ancure Device was unsafe and its warnings were inadequate, he was seeking to impose state law requirements that were " 'different from, or in addition to' " the MDA. Consequently, the state law claims were preempted under the MDA.

## V. Disposition

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.