NOONAN, Circuit Judge,
dissenting:
The issue that this court must address is serious and the magnitude of its potential implications is great:
From 2000 through 2011, more than 150 new high-risk medical devices were approved by the Food and Drug Administration (FDA) through the premarket approval (known as PMA) process, and an additional 600 devices were cleared through the less demanding 510(k) process, in four medical specialty areas (cardiovascular care, neurology, obstetrics and gynecology, and orthopedics; see graph Numbers of High-Risk (Class III) Medical Devices Approved or Cleared by the FDA in Cardiovascular Care, Neurology, Obstetrics and Gynecology, and Orthopedics, 2000-2011.).
“Postmarketing Surveillance of Medical Devices-Filling in the Gaps,” Frederic S. Resnic, M.D., and Sharon-Lise T. Normand, Ph.D., February 14, 2012 (10.1056/ NEJMplll4865).
Has Congress or the Supreme Court created such freedom from liability for the manufacturers of such sensitive devices that only in nonexistent cases are the manufacturers subject to suit for damages? Are individuals injured by the malfunction of such devices without remedy against the manufacturers of them? That appears to be the conclusion of this court today with its holding that the MDA explicitly preempts and implicitly preempts any state remedy of damages for violation of a state requirement paralleling the MDA.
This conclusion, astonishing in its comprehensiveness, is equally astonishing in the light of binding federal law as determined by the United States Supreme Court.
The law. In a case involving the defendant in our case, the Court held:
Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements. Even if it may be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct, or that they created an unreasonable hazard for users of the product, such additional elements of the state-law cause of action would make the state requirements narrower, not broader, than the federal requirement. While such a narrower requirement might be “different from” the federal rules in a literal sense, such a difference would surely provide a strange reason for finding preemption of a state rule insofar as it duplicates the federal rule. The presence of a damages remedy does not amount to the additional or different “requirement” that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing “requirements” under federal law.
Medtronic, Inc. v. Lohr, 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).
As the Supreme Court puts it, “common law duties” not preempted by the express terms of the MDA may “parallel” the *1169 MDA. Such “common law duties” cannot amount to zero because the states may provide a remedy for their breach. See id. Literally, as the Supreme Court also points out, the state may add an element to the state cause of action without destroying the parallel with the federal requirement. Id.
This magisterial exposition of the statute by the Supreme Court sets out what the Supreme Court has consistently held and what is necessary for the correct decision of our case. Nothing in the statute prevents provision by a state of “a traditional damages remedy” for violation of “state duties” that parallel the federal requirements.
The exception to preemption stated by the Court in Lohr was restated by the Court in yet another case involving the present defendant: “§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case ‘parallel,’ rather than add to, federal requirements.” Riegel v. Medtronic, 552 U.S. 312, 330, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (quoting Lohr, 518 U.S. at 495, 116 S.Ct. 2240).
Pellucidly, the Supreme Court has twice interpreted the MDA and held states may provide a damages remedy. In the language of Lohr, it would be “strange” if the Court expressly preserved state remedies from preemption but believed such remedies were implicitly rejected by the statute.
Our court in our present case comes to this strange conclusion by its reading of Buckman, 531 U.S. at 353, 121 S.Ct. 1012, where the Supreme Court disparaged the notion of an “extraneous pull” on the MDA. This reference to “extraneous pull” was surely a make-weight. A dictum, it does not conform with Lohr or stand after Riegel. State damages do exert an additional pull for compliance with the MDA.
Buckman, 531 U.S. 341, 121 S.Ct. 1012, relied on in our case by the majority, predated Riegel and carefully distinguished Lohr. The plaintiffs in Buckman alleged that the manufacturer had committed fraud on the FDA. Buckman, 531 U.S. at 347, 121 S.Ct. 1012. That charge did not allege a state cause of action. Fraud on a federal agency was not a tort that the states had traditionally penalized. Id. “To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character....” Id. “Accordingly—and in contrast the situations implicating ‘federalism concerns and the historic primacy of state regulation of matters of health and safety,’ ...—no presumption against pre-emption obtains in this case.” Buckman, 531 U.S. at 348, 121 S.Ct. 1012 (quoting Lohr, 518 U.S. at 485, 116 S.Ct. 2240). The Court went on to stamp the state claims in the case as “conflict[ing] with” the MDA and “therefore impliedly pre-empted[] by federal law.” Id. (footnote omitted).
The fraud-on-the-FDA claims in Buck-man “exist[ed] solely by virtue of the FDCA disclosure requirements” and did not “rely[] on traditional state tort law which had predated the federal enactments in question[ ].” Id. at 353, 121 S.Ct. 1012; see also id. at 352-53, 121 S.Ct. 1012 (contrasting Buckman’s preempted fraud-on-the-FDA claims with the claims in Lohr, 518 U.S. at 481, 116 S.Ct. 2240, which “arose from the manufacturer’s alleged failure to use reasonable care in the production of the product”). The claims in the present case are traditional, freestanding tort claims, analogous to those in Lohr.
Not a word in Buckman limits Lohr. The majority invoke it but do not show that it has application here. Riegel dem *1170 onstrates that Lohr is still binding law determined by the United States Supreme Court.
The federal requirements. The federal statutory scheme imposes on manufacturers of medical devices a continuous reporting obligation that applies after a device goes to market. 21 U.S.C. § 360i. In its 2008 Warning Letter, detailing the regulatory history, the FDA noted that Medtronic’s Educational Brief of July 2003 was “a reportable correction under CFR 806.10(a)(1).” Whatever information Medtronic gave its physician customers, it had not reported its action to the FDA as a correction. The FDA Warning Letter told Medtronic the incidents of formation of an inflammatory mass at the catheter tip between November 2000 and July 2006 “had not yet been communicated to customers,” that is, the physicians. The FDA letter told Medtronic that the FDA “disagrees with your conclusion that the July 2003 Educational Brief was not a correction or removal.” The new labeling in 2003, the FDA told Medtronic, had not been communicated to physicians “whose patients already had a SynchroMed pump implanted within them.” Stengel’s doctor was in this category of physicians uninformed of the new information.
These failures of Medtronic to report are identified in the FDA letter as acts in violation of the federal statute and the regulations applying it. Under the FDA’s assessment of its conduct, Medtronic was in violation of federal law as early as 2003 because it failed to adequately respond to events indicating that its device posed a specific danger.
The parallel state claims. The Stengels sought to amend their original complaint to allege that Medtronic negligently failed “to provide adequate warnings, information, or both, of the risks and hazards of the pain pump.” The Arizona Supreme Court has recognized a cause of action based on a manufacturer’s failure to remedy or give notice of an unreasonably dangerous condition discovered post-market. See Readenour v. Marion Power Shovel, 149 Ariz. 442, 448, 719 P.2d 1058 (1986) (plaintiff could argue that manufacturer, upon discovering “an unreasonably dangerous condition at any time during the product’s history[,]” should have either retrofitted “each of the models already sold or warn[ed] each of the buyers of the existence of the latent danger”). That Medtronic discovered the danger of granuloma formation after the pain pump went to market does not defeat the Stengels’ cause of action under Arizona law. See id.
Whether the state law claim has elements that further restrict its application is of no import. See Lohr, 518 U.S. at 495, 116 S.Ct. 2240. The Stengels have alleged a valid parallel state law cause of action. Arizona law imposes requirements that parallel the requirements under federal law, and Arizona law provides a remedy in damages for the violation of the state requirement.
The state claim for damages. In their proposed amendment, the Stengels sought the state remedy of damages for the injuries suffered by Richard Stengel as a consequence of Medtronic’s failure to warn of the danger posed by its pump.
To sum up, the Stengels seek to amend their complaint to assert Arizona requirements that parallel federal requirements under the MDA and for which Arizona provides a remedy in damages. The amendments should be allowed.
Appendix
The FDA Warning Letter, addressed to the CEO of Medtronic, July 3, 2008, setting out the history of reports of the inflammatory mass, states:
*1171 A correction or removal conducted to reduce a risk to health posed by a device was not reported in writing to FDA, as required by 21 CFR 806.10(a)(1).
In July 2003 your establishment sent a letter with an enclosed “EDUCATIONAL BRIEF,” entitled “Information about Inflammatory Mass,” to Syn-chroMed customers (physicians). Also enclosed were reprints of two articles published in the December 2002 issue of Pain Medicine and revised labeling for the SynchroMed Technical Manual. FDA defines a “correction” in 21 CFR 806.2(d) as “... the repair, modification, adjustment, relabeling, destruction, or inspection (including patient monitoring) of a device without its physical removal from its point of use to some other location.” FDA believes that the July 2003 Educational Brief, which was sent to all customers using SynchroMed pumps, meets the definition of “correction” in that the letter provided updated labeling to customers for devices that were already in distribution.
The FDA also believes that the July 2003 Educational Brief is a reportable correction under 21 CFR 806.10(a)(1) in that the letter contained specific information intended to reduce the risk to health posed by the device. For example, the July 2003 Educational Brief specifically states that “[i]f an inflammatory mass is detected in its clinical course, prompt discontinuation of opioid delivery into the mass may cause it to shrink or disappear without the need for surgical removal.” The letter also specifically recommends catheter replacement, repositioning, and other interventional procedures, depending on the patient’s clinical condition. These recommendations were neither included in the pump’s original labeling, nor conveyed to customers in a January 2001 communication regarding inflammatory masses.
Additionally, the July 2003 Educational Brief contained new “Post implant” warnings that suggest that clinicians should routinely monitor patients for prodromal clinical signs or symptoms of inflammatory mass such as change in character, quality or intensity of pain; reports of new radicular pain, especially at or near the dermatomal level of the catheter tip; frequent or large escalations of daily drug does to maintain the analgesic effect; and dose escalations that may only temporarily alleviate the patient’s increasing pain. These new warnings were not included in the January 2001 letter or the pump’s original technical manual.
Furthermore, the journal articles included with the July 2003 Educational Brief stated with regard to adverse event reporting that 41 adverse events regarding inflammatory mass were identified as of November 2000 (conveyed to customers in the January 2001 letter). The articles also state that an additional 51 events were identified after the 2001 letter had been distributed to customers. The articles suggest that the number of new adverse events has more than doubled in one year of reporting. It is noteworthy that during the most recent inspection of your facility, your firm calculated the current rate of inflammatory masses to be approximately [redacted] events per [redacted] implants. This figure, which has not yet been communicated to your customers, suggests that the risk of inflammatory masses occurring at or near the tip of intrathecal catheters used with SynchroMed pumps is [redacted] great *1172 er than the [redacted] rate indicated in the January 2001 letter.