**Joseph T. MINK, Plaintiff,**

v.

**SMITH & NEPHEW, INC., a foreign corporation, Defendant.**

**Case No. 15–CIV–61210–BLOOM/Valle**

United States District Court, S.D. Florida.

Signed November 18, 2015

Entered November 19, 2015

Robert Edward O'Connell, Robert E. O'Connell, P.A., Pompano Beach, FL, for Plaintiff.

David J. Walz, Edward Walter Gerecke, Carlton Fields Jorden Burt, P.A., Tampa, FL, for Defendant.

### ORDER

BETH BLOOM, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon Defendant's Motion to Dismiss, ECF No. [16] ("Motion"), Plaintiff's Amended Complaint, ECF No. [6] ("Am.Compl."). The Court has reviewed the Motion, all supporting and opposing filings, including Plaintiff's Response, ECF No. [20] ("Pl. Resp."), and Defendant's Reply, ECF No. [27], and the record in this case. Being fully advised, the Motion is **GRANTED** for the reasons set forth below.

### I. Background

On June 6, 2011, Plaintiff Joseph Mink ("Plaintiff" or "Mink") underwent a hip-replacement surgery. *See* Am. Compl. at ¶ 16. Shortly thereafter, Mink began experiencing elevated chromium and cobalt levels in his blood, metal ions which are toxic to the human body at certain levels. *See id.* ¶¶ 23–24. Mink suffered deleterious effects from the large content of metal ions in his bloodstream, *id.* ¶¶ 25–28, and now brings this action for damages related to the harm that he incurred.

Defendant Smith & Nephew, Inc. ("Defendant" or S & N") develops and manufactures joint replacement systems, including a metal-on-metal hip resurfacing prosthesis comprised of a femoral head and hemispherical acetabular cup, known as the "Birmingham Hip Resurfacing System" (the "BHR," "BHR System," or "System"). *Id.* ¶¶ 7–8. Prior to its commercial distribution, the BHR underwent premarket approval ("PMA") by the Food and Drug Administration ("FDA"). *Id.* ¶ 9. The BHR received conditional approval on May 9, 2006, which permitted S & N to distribute the BHR in accordance with certain conditions imposed by the FDA, including FDA approval of supplemental changes affecting the safety or effectiveness of the device, post-approval reporting requirements, and adverse reaction and device defect reporting. *Id.* ¶¶ 9–10; Exhibit "A" to Am. Compl., May 9, 2006, FDA Approval Letter, ECF No. [6–1] ("PMA Approval Letter") at 1, 6–9.

After being diagnosed as requiring a hip replacement, Mink's orthopedic surgeon scheduled the surgery with a competing manufacturer's system. Am. Compl. ¶¶ 11–12. Upon learning of S & N's BHR System through advertisements, Mink met with Jason Weisstein, M.D. ("Dr.Weisstein"), an orthopedic surgeon purportedly

acting as an agent and representative of S & N. *Id.* ¶¶ 12–13. Dr. Weisstein advised Mink of the BHR's FDA premarket approval and informed Mink that if he agreed to use the BHR, he would be included in S & N's 10–year post approval study, where he would be regularly monitored with follow-up visits and testing for 10 years at no personal cost (the "BHR Study" or "Study"). *Id.* ¶ 14. Based on these representations made by Dr. Weisstein, Mink agreed to undergo his hip replacement surgery using the BHR system and signed a form consenting to his involvement in the post-surgery study. *Id.* ¶ 15; Exhibit "B" to Am. Compl., Consent to Participate in a Clinical Research Study Entitled: A Prospective, Multi–Centered Study of the Birmingham Hip Resurfacing System, ECF No. [6–2] ("Consent to Participate Form") at 2–10.

As noted above, Mink began encountering adverse effects of the BHR System shortly after it was installed. *See* Am. Compl. ¶¶ 23–24. He suffered from eye problems and an enlarged left inguinal lymph node near the operative site that had to be surgically removed. *Id.* at ¶ 25.

Additionally, Mink was no longer able to participate in the BHR Study. *Id.* ¶¶ 18–23. In August 2011, Dr. Weisstein advised Mink that he was relocating due to a job opportunity and that the BHR Study would not continue at his office. *Id.* ¶¶ 18–19; Exhibit "C" to Am. Compl., ECF No. [6–3] ("August 1st Weisstein Letter") at 2. Stating that he was in communication with S & N regarding Mink's continued involvement in the BHR Study, Dr. Weisstein told Mink that he would arrange a convenient, local follow-up. *Id.* On August 18, 2011, Dr. Weisstein made good on his promise and informed Mink that S & N had arranged for him to continue as a participant in the BHR Study with Grego-

ry Martin, M.D. ("Dr.Martin"). Am. Compl. ¶ 20; *see also* Exhibit "D" to Am. Compl., ECF No. [6–4] ("August 18th Weisstein Letter") at 2. Assuming that the visit to Dr. Martin would be covered by the BHR Study, Mink was surprised when Dr. Martin knew nothing about him or his participation in the BHR Study. *See* Am. Compl. ¶ 21. Mink received a bill for his visit. *Id.* On May 14, 2012, S & N informed Mink that the BHR Study had been terminated with Mink's regional hospital and that S & N was unable to identify a clinical site to continue the follow-up study activities. *See id.* ¶ 22; Exhibit "E" to Am. Compl., ECF No. [6–5] ("Termination Letter") at 2. Accordingly, S & N released Mink from the Study and explained to him that he would not be subject to any follow-up obligations. *See* Termination Letter at 2. Mink did not wish to be terminated from the BHR Study and, due to the ever-increasing toxicity of his blood, was obligated to monitor the situation at his own expense. *See* Am. Compl. ¶¶ 23–24. On November 17, 2014, Mink underwent a second, corrective surgery to remove the BHR that was allegedly poisoning him. *Id.* ¶ 30.

Due to the injurious effects of the BHR, Mink asserts that the System was defective "in that it did not meet the requirements of the FDA to comply with current good manufacturing practices to insure that the finished BHR [would] be safe and effective and otherwise in compliance with 21 U.S.C. Section 360(e)." *Id.* ¶ 27. Mink further alleges that the sole basis for termination of the Study, both with him individually and with his local hospital, was avoidance of reporting requirements. *Id.* ¶ 29.

Thus, Mink brings three claims predicated upon the alleged fact that S & N violated federal safety statutes and regulations.[1]

---

1. Mink cites violations of 21 C.F.R. §§ 820.30(f) and (g), 21 C.F.R. §§ 820.80(c)

*Id.* ¶¶ 37, 42. First, Mink brings a claim for negligence stemming from S & N's purported violations of a laundry list of related federal regulations, and asserts that S & N breached its duty to comply with the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360 *et seq.* (the "FDCA" or "Act") ("Count I"). *See id.* ¶¶ 31–38. Second, Mink brings a claim for strict products liability, believing that the BHR System was "unreasonably dangerous" when it left S & N's control and entered the stream of commerce ("Count II"). *See id.* at ¶¶ 37–43.[2] Third, Mink alleges that S & N breached an express or implied warranty by (1) failing to honor the bargain that Mink would continue as a BHR Study participant, and (2) by expressly warranting that the BHR System was in full compliance with FDA PMA conditions ("Count V"). *See id.* ¶¶ 62–69.

Mink also brings claims for breach of contract ("Count III") and negligent misrepresentation ("Count IV"). *See generally id.* ¶¶ 44–61. Under his theory of breach of contract, Mink contends that S & N failed to comply with the terms of the Consent to Participate Form by terminating him as a Study participant and declining to transfer Mink to another approved doctor to continue the Study. *Id.* ¶¶ 44–55. Mink's claim for negligent misrepresentation travels under a similar theory, namely, that S & N misrepresented to Mink that he would be a continuing BHR Study participant and would receive the benefits thereof for a minimum of 10 years at no out-of-pocket cost to him. *See id.* ¶¶ 55–61. He alleges that these misrepresentations induced him to abandon the competitor's product and, instead, sign up for implantation of the BHR. *See id.*

S & N now seeks dismissal, stating that the entirety of Mink's Amended Complaint is preempted under federal law and otherwise fails to allege parallel claims. *See generally* Motion.

## II. Legal Standard

Rule 8 of the Federal Rules requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on " 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955 (alteration in original)). These elements are required to survive a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requests dismissal for "failure to state a claim upon which relief can be granted."

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1337 (11th Cir.2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance,* 304 F.3d 1076, 1084 (11th Cir.2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,*

---

and (d), 21 C.F.R. § 820.100, and 21 C.F.R. § 820.198. *See id.* ¶¶ 35, 40.

**2.** The Amended Complaint contains duplicative paragraphs in Counts I and II. *See id.* ¶¶ 37–38.

608 F.Supp.2d 1349, 1353 (S.D.Fla.2009) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true."). Accordingly, a court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.,* 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Technologies, Inc.,* 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt,* 304 F.3d 1125, 1135 (11th Cir.2002)).

However, although a court is required to accept all of the allegations contained in the complaint and exhibits attached to the pleadings as true, this tenet is inapplicable to legal conclusions. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937; *Thaeter v. Palm Beach Cnty. Sheriff's Office,* 449 F.3d 1342, 1352 (11th Cir.2006). The Supreme Court was clear that courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Through this lens, the Court addresses the instant Motion.

### III. Discussion

Defendant argues that Plaintiff fails to state a claim because (1) express preemption bars state-law claims like Plaintiff's against products, like the BHR System here, approved through the PMA process; and (2) Plaintiff fails to allege a parallel claim premised upon a violation of federal specifications or specific PMA requirements, the only category of claim that might theoretically survive preemption, including any allegation related to his enrollment in a clinical study. *See* Motion at 3.

Plaintiff counters that his claims are neither expressly nor impliedly preempted and contain sufficient facts to state plausible claims for relief. For these reasons, he requests that the Court deny Defendant's Motion or, in the alternative, allow him to amend the complaint to include additional claims, including a failure to warn. *See* Pl. Resp. at 2.

However, in support of his claims, Plaintiff relies exclusively on case law outside of the Eleventh Circuit—when ample authority exists in this Circuit, some of which is binding on the Court, as analyzed in detail below. Conspicuously absent from Plaintiff's Response is any cite, reference, or even acknowledgement of the existence of these cases, which are directly on point. Instead, Plaintiff rests solely upon cases "in other jurisdictions" and "across the country." *See id.* Invoking a clear red herring, "rather than perform the Class III medical device preemption analysis with citations to the controlling cases," Plaintiff prefers "a more useful approach" of "recap[ping] the numerous federal cases" elsewhere. *Id.* at 15 (emphasis added). But, for obvious reasons, the Court refrains from considering the non-Florida cases to which Plaintiff refers, predicated upon standards disparate from and irrelevant to Florida law—eight of which are actually attached as exhibits to the Response. *See* ECF Nos. [20–1]–[20–8]; *see, e.g., Marmol v. St. Jude Med. Ctr.,* No. 8:15–cv–1276–T–30TGW, 132 F.Supp.3d 1359, 1367–68, 1369–70, 2015 WL 5664890, at *7, 9 (M.D.Fla. Sept. 24, 2015) ("Indeed, every court in this circuit to have directly addressed this issue has consistently held that private actions that seek to enforce violations of FDA regulations including PMA requirements are barred because Florida does not recognize such causes of action.... To the extent that [p]laintiff relies on [authority from other Circuits], the Court is unpersuaded.

Those cases consider the laws of [other States], but the inquiry, by its very nature, is dependent upon state-specific law.") (citations omitted).

## A. Relevant Law

On May 9, 2006, the FDA notified S & N that the BHR System had received conditional approval, and S & N could begin commercial distribution of the device. This approval letter imposed a number of specific requirements pursuant to the Medical Device Amendments (MDA) to the FDCA, which Congress enacted in 1976 to create a regulatory framework for medical devices. Within this framework, the FDA groups prescription medical devices into three classes. *See* 21 U.S.C. § 360c(a)(1). The BHR System was classified as Class III device, which must undergo a "rigorous" pre-market approval process before it can be marketed. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 317–18, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (citing 28 U.S.C. § 360e(d)) (explaining that the FDA grants PMA approval only when it has " 'reasonable assurance' of the device's 'safety and effectiveness' ").

The FDA has promulgated numerous regulations regarding PMA requirements for Class III medical devices. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 344–47, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). These regulations require a PMA applicant to produce comprehensive data from which the FDA can make a reasonable determination of the device's safety and effectiveness, including the human clinical trials, design specifications, manufacturing processes, quality controls, and proposed labeling and advertising. *See* 21 C.F.R. § 814.20; *see also Riegel*, 550 U.S. at 318, 127 S.Ct. 1686 (citing 21 U.S.C. §§ 360c(a)(2)(B), 360e(d)(1)(A)).

After PMA approval, the FDA imposes ongoing mandates for manufacturers of Class III devices. A manufacturer may not change "design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness" without first obtaining the FDA's authorization. *Id.* at 319, 127 S.Ct. 1686 (citing 21 U.S.C. § 360e(d)(6)(A)(i)). A manufacturer must receive supplemental approval from the FDA for any changes, and the FDA evaluates any such proposed changes "under largely the same criteria as an initial application." *Id.* (citing 28 U.S.C. § 360e(d); 21 C.F.R. § 814.39(c)). "All procedures and actions that apply to a PMA application under [21 C.F.R. § ] 814.20 also apply to PMA supplements except that the information required in a supplement is limited to that needed to support the change." 21 C.F.R. § 814.39(c). Class III devices are also subject to post-approval reporting requirements, including informing the FDA of new studies, investigations, or incidents where the device caused or could have caused serious injury. *See Riegel*, 552 U.S. at 319, 128 S.Ct. 999. Additionally, manufacturers are required to follow the FDA's Current Good Manufacturing Practice (CGMP) provisions. *See* 21 C.F.R. § 820.1. The FDA retains the authority to withdraw approval. *See Riegel*, 552 U.S. at 319–20, 128 S.Ct. 999.

Given this underlying regulatory scheme, Congress enacted protection for Class III medical devices. Pursuant to § 360k(a) of the MDA, state-law causes of action against manufacturers of Class III medical devices, like S & N, are expressly preempted to the extent they impose requirements "different from, or in addition to," the requirements of federal law:

No State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—(1) which is different from, or in addition to, any requirement applicable under this chap-

ter to the device and (2) which relates to the safety or effectiveness of the device or to any other matter included in the requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a) (emphasis added). The Supreme Court has recently held that this language preempts any state-law claims regarding "the design, testing, inspection, distribution, labeling, marketing and sale of" PMA products. *Riegel*, 552 U.S. at 320, 128 S.Ct. 999 (citing *id.*) (barring a tort claim that applies a state law requirement, which (1) relates to safety or effectiveness, and (2) is "different from, or in addition to, any [applicable federal] requirement"); *see also Byrnes v. Small*, 60 F.Supp.3d 1289, 1297 (M.D.Fla.2015) (quoting *Buckman*, 531 U.S. at 349 n. 4, 121 S.Ct. 1012) ("[T]he FDCA also impliedly preempts suits by private litigants 'for noncompliance with the medical device provisions.'"). Nevertheless, *Riegel* found that the MDA preemption clause does not apply to a parallel claim. *See id.* at 330, 128 S.Ct. 999. In other words, "§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case parallel, rather than add to, federal requirements." *Id.* (citation omitted).

Thus, to the extent that preemption applies, to withstand Defendant's Motion, Eleventh Circuit case law requires Plaintiff to plead that S & N breached federal requirements applicable to BHR and that the breach is parallel to a claim under Florida state law. *See Wolicki–Gables v. Arrow Intern., Inc.*, 634 F.3d 1296, 1301 (11th Cir.2011). Although *Wolicki–Gables* affirmed a district court opinion in the summary judgment context, the Circuit Court held that the inquiry must start with the pleadings—proper analysis "must first consider whether the [plaintiffs] have demonstrated that they have alleged a parallel claim." *Id.* at 1301. To that end,

"'[p]laintiffs cannot simply incant the magic words '[defendants] violated FDA regulations' in order to avoid preemption.'" *Id.* (quoting *In re Medtronic Inc.*, 592 F.Supp.2d 1147, 1158 (D.Minn.2009)). Rather, "[i]n order for a state requirement to be parallel to a federal requirement, ... the plaintiff must show that the requirements are 'genuinely equivalent.' State and federal requirements are not genuinely equivalent if a manufacturer could be held liable under the state law without having violated the federal law." *Id.* at 1300 (quoting *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir.2005)); *see Llado–Carreno v. Guidant Corp.*, No. 09–20971–CIV, 2011 WL 6223409, at *5 (S.D.Fla. May 16, 2011) ("Parallel claims must be specifically stated in the initial pleadings.").

*Wolicki–Gables* involved a patient who developed complications after undergoing surgery to implant an allegedly defective drug delivery pump system for treatment of chronic pain. 634 F.3d at 1301. The patient, along with her husband, brought a negligence and strict products liability action against the manufacturer of the pump system and related companies. *Id.* After analysis of Florida state laws concerning "(1) strict liability for manufacturing and design defect and failure to warn, and (2) concerning liability for negligent design, manufacture and assembly," the district court concluded "that the Florida laws corresponding to each of those claims imposed requirements that were 'different from, or in addition to' the federal requirements established for the" specific device. *Id.* Critically, such claims were expressly preempted because "a factfinder could find liability even if the manufacturer had completely complied with the FDA regulations." *Id. Wolicki–Gables* further found that the couple failed to "set forth any specific problem, or failure to comply with any FDA regulation that can be linked to

the injury alleged." *Id.* at 1301–02 (citation omitted). "Because the [plaintiffs] failed to allege facts in their complaint demonstrating the presence of the elements of a parallel claim," the Court concluded that the subject claims were preempted under the MDA. *Id.* at 1302.

Since *Riegel* and *Wolicki–Gables*, trial courts within Florida, and within this District, have dismissed strict liability and negligence claims at the pleadings stage, because Florida state-law on these causes of action "clearly impose[ ] requirements which are 'different from, or in addition to' the federal requirements." *Stokes v. I-Flow Corp.,* No. 6:12–cv–991–Orl–36DAB, 2013 WL 1715427, at *7 (M.D.Fla. Apr. 8, 2013) (granting motion to dismiss); *see Llado–Carreno,* 2011 WL 6223409, at *6 ("Accordingly, the negligence and strict liability claims must be dismissed as preempted by federal law."); *Kaiser v. DePuy Spine, Inc.,* 944 F.Supp.2d 1187, 1190–91 (M.D.Fla.2013) (dismissing claims and holding that claims under "state tort law" are preempted when they "involve[ ] requirements that were different from, or in addition to, federal requirements"); *Stanifer v. Corin USA Ltd.,* No. 6:14–cv–1192–Orl–37DAB, 2014 WL 5823319, at *4 (M.D.Fla. Nov. 10, 2014) (granting motion to dismiss under *Riegel* and *Wolicki–Gables* ); *Lederman v. Howmedica Osteonics Corp.,* 950 F.Supp.2d 1246, 1249 (M.D.Fla. 2013) (granting motion to dismiss because "any claim that would require the medical device to be manufactured other than in the manner approved and required by the PMA ... imposed a requirement 'different from, or in addition to' the PMA requirements"). In other words, "[t]he preemption provision of the MDA exists to dissuade the possibility of such a conflicting result" as a Florida state law "determination that the product is defective or unreasonably dangerous," though compliant with FDA regulations. *Brown v. DePuy Ortho-* *paedics, Inc.,* 978 F.Supp.2d 1266, 1272–73 (M.D.Fla.2013).

Many courts have also dismissed complaints for failure to sufficiently allege a parallel claim under *Wolicki–Gables.* *See, e.g., Llado–Carreno,* 2011 WL 6223409, at *5–6 (dismissing claims as not parallel). In *Llado–Carreno,* the court rejected "general allegations" as "insufficient to satisfy the requisite elements of a parallel claim" when they lacked "any factual detail to substantiate [the] crucial allegation." *Id.* at *5 (quoting *Wolicki–Gables,* 634 F.3d at 1302); *see, e.g., Wheeler v. DePuy Spine, Inc.,* 706 F.Supp.2d 1264, 1267–68 (S.D.Fla.2010) ("Plaintiff has not stated a claim for products liability that can proceed, as [p]laintiff has not made a claim premised on a violation of FDA regulations.") (citation omitted); *Lederman,* 950 F.Supp.2d at 1250 (dismissing claim as not parallel because a plaintiff must plead the specific requirements of *Wolicki–Gables* ); *McClelland v. Medtronic, Inc.,* 944 F.Supp.2d 1193 (M.D.Fla.2013), 11991200 (M.D.Fla.2013) (dismissing claim as not parallel); *Kaiser,* 944 F.Supp.2d at 1192 (dismissing claims as not parallel because they failed to "identify any particular federal specification or specific PMA requirement or FDA regulation that [d]efendant violated"); *see also Leonard v. Medtronic, Inc.,* No. 1:10–CV–03787–JEC, 2011 WL 3652311, at *6 n. 5 (N.D.Ga. Aug. 19, 2011) ("[T]he Court must apply Eleventh Circuit law, which requires more than a general allegation of an FDA violation to state a valid parallel claim.").

### B. Application Here

■ Here, Counts I and II of the Amended Complaint fall squarely within the range of claims preempted by *Riegel* and *Wolicki–Gables.* Plaintiff contends that the BHR System was defective in "design or manufacture," Am. Compl. ¶ 30, and that S & N made negligent misrepre-

sentations regarding the clinical study he was enrolled in, *id.* ¶¶ 55–61. But, he offers no facts in support of this assertion to establish a violation. Instead, Plaintiff sets forth a laundry list of general regulations, pursuant to the CGMP provisions, that S & N allegedly violated. *See* Am. Compl. ¶¶ 35, 40. These conclusory allegations amount to the same type of "magic words" or blanket claims that the Eleventh Circuit expressly prohibits. *See Horn v. Boston Scientific Neuromodulation Corp.,* No. CV409–074, 2011 WL 3893812, at *9 (S.D.Ga. Aug. 26, 2011) ("The [CGMP] regulations [p]laintiff references … fail to provide any tangible or concrete standard…. [A]llow[ing] a violation of such a flexible standard to result in liability would, in itself, be imposing a standard 'different from or in addition' [to] those imposed by the MDA."). These assertions challenge the safety and efficacy of the BHR System, and seek to impose requirements that are different from, or in addition to, the requirements imposed by the FDA. As a result, the Court must hold that these claims are expressly preempted.

■ Under Count III, Plaintiff styles his termination from the study as a state law "breach of contract" claim. *See* Am. Compl. ¶¶ 44–55. However, he does not allege facts establishing a contract between himself and S & N, nor a breach of any provision prohibiting his termination from the Study. *See Brown v. Capital One Bank (USA), N.A.,* 2015 WL 5584697, at *3 (S.D.Fla. Sept. 22, 2015) ("Plaintiffs must allege the following elements to state a claim for breach of contract: (1) a valid contract; (2) a material breach; and (3) damages. In order to allege a material breach in accordance with the pleading standards required under the Federal Rules of Civil Procedure, the plaintiff must allege which provision of the contract has been breached.") (citations omitted). Plaintiff attaches to his Amended Complaint the Consent to Participate Form

between himself and Dr. Weisstein. But, he cites no facts showing that, for example, in obtaining Plaintiff's informed consent, Dr. Weisstein was "acting as S & N's agent." To the extent that no other contract exists, Plaintiff's breach of contract claim is both insufficient under state law and also preempted by federal post-approval study requirements, which obligate the physician "investigator," not the manufacturer, to obtain the patient's informed consent. *See* 21 C.F.R. 812.100.

Plaintiff also brings a claim, under Count IV, for negligent misrepresentation based on the notion that S & N represented that it would monitor him through the study for a minimum of ten years. However, this Study was dictated by federal statute. *See* 21 C.F.R. § 814.82(a)(2) ("Post-approval requirements may include as a condition to approval of the device: … (2) Continuing evaluation and periodic reporting on the safety, effectiveness, and reliability of the device for its intended use. FDA will state in the PMA approval order the reason or purpose for such requirement and the number of patients to be evaluated and the reports required to be submitted."). Because this claim attempts to create requirements not imposed by federal law, it is expressly preempted by 21 U.S.C. § 360(k) under *Riegel* and its progeny, including *Wolicki–Gables.*

Even if federal requirements prohibited Plaintiff's termination from the study due to relocation of his physician, a termination does not violate a Florida state law tort duty, as would be necessary to sufficiently allege a "genuinely equivalent" parallel claim. Plaintiff does not cite to, and the Court is unaware of, any Florida law that requires a manufacturer to pay for post-surgical monitoring. Rather, Plaintiff's claims have the effect of not only creating additional requirements under federal law, but also privately enforcing the FDA's fed-

eral regulatory scheme. Such attempt at private enforcement is impliedly preempted. *See, e.g., Leroy v. Medtronic, Inc.*, No. 3:14cv284/MCR/CJK, 2015 WL 4600880, at *3 (N.D. Fla. June 29, 2015) ("[A]ctions which seek to enforce an exclusively federal requirement not grounded in traditional state tort law are impliedly preempted.").[3]

Another court in this District recently addressed this very issue regarding PMA products. *See Wheeler*, 706 F.Supp.2d at 1268–70. In *Wheeler*, the plaintiff attempted to state a parallel claim by alleging that the defendant violated certain requirements imposed by the FDA pursuant to the PMA process. *Id.* at 1269. The court rejected the allegations in their entirety:

> Even if these [ ] characteristics were to be construed as federal requirements, [p]laintiff has failed to assert a state law authorizing such claims and, therefore, his claim must fail. . . . Whether these claims are characterized as negligent design, manufacture, or sale of the product, Florida law does not authorize the only type of "negligence" claims that might survive the MDA, i.e., a claim based on violation of federal requirements.

*Id.* at 1269–70. The court reasoned "that the MDA shields manufacturers of FDA-approved medical devices from state products liability laws absent a specific state law providing a damages remedy for claims premised on violations of FDA regulations." *Id.* at 1268. As a result, "com-

mon law products liability or negligence actions—i.e., actions not based on a 'parallel' requirement adopted by a state—are preempted by the MDA." *Id.* at 1270. The "claims are preempted to the extent that they are not based on violations of federal requirements, and the claims fail to the extent that they are based on violations of federal requirements, as Florida law does not provide such a remedy." *Id.* Plaintiff does not point to, and the Court is unaware of, any Florida or federal law that requires a medical-device manufacturer to maintain a patient in a product study or fund patient monitoring.

■ Similarly, under Count V, Plaintiff's breach of express warranty claim does not contain facts establishing that S & N made affirmations that became the basis of any bargain between S & N and Plaintiff, or how breach of any such affirmation proximately caused damage to Plaintiff. *See Byrnes*, 60 F.Supp.3d at 1300–01 (citing Fla. Stat. § 672.313(1)(a) ("Express warranties by the seller are created as follows: Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain.")). As noted, the informed consent document was signed by Plaintiff's physician, not S & N. Further, Plaintiff alleges that S & N "expressly warranted that its BHR System was in full compliance with the FDA Premarket Approval conditions" and "that the BHR System was safe and effective for use." Am. Compl. ¶ 66. However, these

---

**3.** In his Complaint, Plaintiff alleges that S & N terminated him from the study to avoid reporting his increased metal ion levels and alleged complications to the FDA. Am. Compl. ¶ 29. However, again, this allegation is conclusory. In any event, to the extent that Plaintiff can properly allege a motive in terminating him from the Study, his claim remains expressly preempted because he is attempting to create additional requirements under Florida law, as federal law did not prohibit his

termination. Moreover, his claim would be impliedly preempted because he is alleging exactly the kind of "fraud on the FDA" claim prohibited by *Buckman*, 531 U.S. at 352, 121 S.Ct. 1012. In *Buckman*, the Supreme Court found that allegations of an improper motive in obtaining a lawful product clearance are impliedly preempted because the authority to police fraud is within the FDA's exclusive enforcement discretion. *Id.*

allegations do not concern characteristics of the product that Plaintiff received, much less a guarantee as to the ion issues that allegedly caused Plaintiff's health problems. It does not appear that the FDA ever revoked its PMA approval of the System. As provided by the MDA preemption clause, a state-law warranty claim cannot allege that a device is unsafe and ineffective when the FDA has made an express finding in contravention of that claim.

Also under Count V, Plaintiff alleges that the BHR System was not of merchantable quality, as it allegedly "caused toxic levels of chromium and cobalt to develop in Plaintiff's body to the extent that it was unsafe." Am. Compl. ¶ 67. This implied warranty claim challenges the design of the BHR System and is expressly preempted. *See Riegel*, 552 U.S. at 327, 128 S.Ct. 999. Moreover, Plaintiff's conclusory allegations that S & N warranted that the System would not release metal ions is inconsistent with the informed consent that Plaintiff signed, which states that "the risk associated with cobalt to chromium metal ion release into the bloodstream ... is currently unknown and monitored as part of this study." Consent to Participate Form ¶ 5. Thus, not only is Plaintiff's implied warranty claim expressly preempted, it is refuted by the documentation that Plaintiff signed.[4]

## IV. Conclusion

Although the Court is sympathetic to the harm suffered by Plaintiff from the BHR System, binding Eleventh Circuit precedent dictates that Plaintiff's claims, in this context, are expressly preempted by the MDA and, further, fail to state a

parallel claim under state law. Of course, "[a] district court, before dismissing a complaint with prejudice because of a mere pleading defect, ordinarily must give a plaintiff one opportunity to amend the complaint and to cure the pleading defect." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1239 (11th Cir.2000) (citing *Isbrandtsen Marine Servs., Inc. v. M/V INAGUA Tania*, 93 F.3d 728, 734 (11th Cir. 1996)). Here, Plaintiff has already submitted an Amended Complaint. Nevertheless, the Court will afford Plaintiff a last opportunity for amendment to state a valid parallel claim, to the extent that any such claim exists. Plaintiff is cautioned that any allegations of a failure to warn, as proposed in the Response, would also be preempted. *See Wolicki–Gable*s, 634 F.3d at 1301 (affirming preemption of "failure to warn" claims under Florida law); *Marmol*, 132 F.Supp.3d at 1370, 2015 WL 5664890, at *9 ("[E]ach court in this circuit that has addressed the viability of a failure-to-warn claim in relation to a medical device governed by the PMA process, has determined that the claim is impliedly preempted."). Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss, **ECF No. [16]**, is **GRANTED.**

2. Plaintiff's Amended Complaint, **ECF No. [6]**, is **DISMISSED** without prejudice.

3. Plaintiff shall file a Second Amended Complaint addressing the deficiencies identified herein by **no later than December 2, 2015.**

---

4. Plaintiff's express warranty claim is belied by this disclosure, as the "bargain" allegedly reflected in the informed consent agreement that the device was "safe and effective" is contradicted by the statement that the risk was unknown. Indeed, Plaintiff cannot claim that S & N warranted that ions would not pose any risks to patients when the very point of the Study was to investigate metal ion release.

DONE AND ORDERED in Miami, Florida, this 18th day of November, 2015.